## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MAGAN S. WALKER,                    )
                                    )
            Plaintiff,              )
                                    )        Civil Action No. 12-1650
      v.                            )
                                    )        Magistrate Judge Cynthia Reed Eddy
COMMISSIONER OF                     )
SOCIAL SECURITY,                    )        Electronic Filing
                                    )
            Defendant.              )


## MEMORANDUM OPINION

August 1, 2013


### I.   INTRODUCTION

Magan S. Walker ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  This matter comes before the court on cross

motions for summary judgment.  The record has been developed at the administrative level.  For

the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 10) will be DENIED,

and Defendant's Motion for Summary Judgment (ECF No. 12) will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on May 6, 2009, and for SSI on May 19, 2009, claiming an inability to work as of December 24, 2008. (R. at 119 – 25)[1]. Plaintiff initially alleged disability as a result of limitations stemming from a learning disability, adjustment disorder, anxiety, and depression. (R. at 137). Plaintiff was initially denied benefits on October 9, 2009. (R. at 60 – 68). A hearing was scheduled for February 4, 2011, and Plaintiff appeared to testify, represented by counsel. (R. at 22 – 56). A vocational expert also testified. (R. at 22 – 56). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on February 18, 2011. (R. at 7 – 21). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on September 25, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this court on November 13, 2012. (ECF No. 3). Defendant filed an Answer on January 24, 2013. (ECF No. 8). Cross motions for summary judgment followed. (ECF Nos. 10, 12).

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on January 30, 1986, was twenty-three years of age at the time of her application for benefits, and twenty-five years of age at the time of her administrative hearing. (R. at 133). Plaintiff graduated high school with special educational assistance. (R. at 142, 187 – 209). Plaintiff completed certification for "protective services" at a local vocational-technical school, and attended Butler County Community College for criminal justice; although, she was not able to complete the college program. (R. at 323). She lived in a home with her mother,

---

[1] Citations to ECF Nos. 9 – 9-12, the Record, *hereinafter*, "R. at __."

sister, cousin, and young child. (R. at 145). Plaintiff's past relevant work included employment as a 411 phone operator, a police dispatcher, a laborer, a fast food restaurant cashier, and a staff assistant. (R. at 138, 154). She last worked as a staff assistant at a group home in December 2008, and quit that job due to stress. (R. at 137 – 38). Plaintiff subsisted on welfare benefits from the state. (R. at 32, 323). Plaintiff also had a medical assistance card. (R. at 136, 323).

## B. Treatment History

On November 13, 2009, Plaintiff presented to her primary care physician George F. Reeher, D.O. complaining of suicidal and homicidal thoughts, and was worried about injuring others. (R. at 247). Plaintiff had been off of psychiatric medications since November 2008 as a result of elevated liver enzyme levels. (R. at 247). Prior to that time, Plaintiff had been feeling significant improvement with medication, and was "doing well" handling the challenges of work with problematic teenage girls. (R. at 251). Dr. Reeher advised Plaintiff to go to the hospital. (R. at 247).

Plaintiff was admitted to the emergency department of Sharon Regional Health System in Sharon, Pennsylvania on January 13, 2009. (R. at 258). Plaintiff complained of increased mood lability, instability, depression, and intermittent suicidal and homicidal ideation. (R. at 262). Plaintiff had gone without medication for two or three months. (R. at 262). Plaintiff was thereafter admitted to the Adult Psychiatric Unit, and was diagnosed with adjustment disorder with mixed depression and anxiety, and bipolar disorder, NOS. (R. at 258). Her global assessment of functioning[2] ("GAF") score at admission was 20. (R. at 264). Plaintiff was placed

---

[2]    The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication." *Id.*

3

on Effexor and Eskalith. (R. at 258). Subsequently, her mood and anxiety improved, she was cooperative, she attended group therapy, she denied suicidal and homicidal ideation, her sleep and appetite were good, and she reported no medication side effects. (R. at 258). At the time of discharge on January 16, Plaintiff's GAF score was 40[3]. (R. at 258). She was advised to follow up with a psychiatrist for medication, and to engage in regular therapy. (R. at 258).

Plaintiff was first examined by Wally Novero, M.D. on February 5, 2009 following her discharge from psychiatric inpatient treatment. (R. at 242 – 44). Plaintiff was referred to Dr. Novero for medication management. (R. at 242). Dr. Novero noted Plaintiff's history of adjustment disorder with depression and anxiety, and potential bipolar disorder. (R. at 242). Plaintiff reported ongoing issues with anxiety, mood swings, and anger. (R. at 242). Since Plaintiff had been discharged, she reported compliance with her psychiatric medication regimen. (R. at 242). She denied suicidal ideation, and did not experience racing thoughts to the extent that she once had. (R. at 242). She was providing some care for her one year old daughter. (R. at 424).

Dr. Novero indicated that Plaintiff had engaged in some form of psychiatric treatment since six years of age. (R. at 242). Following discharge from the inpatient clinic, she had been placed on Effexor and Eskalith. (R. at 243). Plaintiff was observed to be calm, coherent, logical, and cooperative. (R. at 243). Plaintiff's mood was "okay," but her affect was blunted. (R. at 243). Plaintiff exhibited difficulty counting backwards, but was able to interpret simple proverbs and had an average fund of knowledge. (R. at 243). Her language was unremarkable. (R. at 243). Her psychomotor activity was relaxed, and her insight and judgment were fair. (R. at

---

[3]    An individual with a GAF score of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

243). Her GAF score was $45 - 49^4$. (R. at 244). Dr. Novero diagnosed Plaintiff with adjustment disorder with mixed depression and anxiety, history of learning disorder, NOS, and rule out bipolar disorder, NOS. (R. at 243). He added prescription Abilify to Plaintiff's regimen. (R. at 244). Plaintiff was to continue with therapy. (R. at 244).

Plaintiff returned to see Dr. Novero on April 9, 2009. (R. at 240). Plaintiff claimed that she was sleeping less and experiencing homicidal dreams. (R. at 240). However, Plaintiff's anxiety, depression, and anhedonia had decreased. (R. at 240). Plaintiff's appetite was fair and her concentration was good. (R. at 240). Plaintiff denied suicidal or homicidal ideation, she was coherent and logical, her affect was neutral, and her insight and judgment were fair. (R. at 240). In addition to her other medications, Plaintiff was also placed on Trazadone. (R. at 240).

On April 29, 2009, Plaintiff asked Dr. Novero to clear her for gastric bypass surgery. (R. at 239). Plaintiff had not met with a dietician or exhausted other less drastic means of weight loss. (R. at 239). Her mood was "alright," her affect was neutral, she was logical, and she denied suicidal and homicidal ideation. (R. at 239). She did complain of increased nightmares, insomnia, and depression. (R. at 239). He did not clear her for the surgery, and advised her to first attempt diet and exercise. (R. at 239).

Plaintiff returned to Dr. Novero on June 4, 2009 for a regular medication check. (R. at 238). Plaintiff's mood was "alright," her affect was neutral, she was logical and coherent, and she denied suicidal or homicidal ideation. (R. at 238). Plaintiff's irritability and impulsiveness had increased. (R. at 238). However, she had ceased taking her medication for several weeks, because she had been angry with Dr. Novero for not approving her gastric bypass surgery. (R. at 238). She had instead begun seeing a dietician and increased her activity level. (R. at 238).

---

[4]     An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

On August 19, 2009, Dr. Novero noted that Plaintiff had stopped taking Eskalith because of headaches. (R. at 237). She was irritable and had increased mood swings and insomnia. (R. at 237). She denied suicidal and homicidal ideation, and she appeared to be logical. (R. at 237). Her other medications were adjusted. (R. at 237).

On September 30, 2009, Plaintiff returned to Dr. Novero complaining of increased crying spells, increased depression, decreased sleep, and occasional agitation. (R. at 236). She denied suicidal and homicidal ideation, her mood was "down," her affect was blunt, and she was logical. (R. at 236). She reported that she was compliant with medications and continued to attend therapy sessions. (R. at 236). Her medications were adjusted. (R. at 236).

At a November 11, 2009 medication check, Dr. Novero reported that Plaintiff complained of worsening insomnia, but only "slight depression." (R. at 235). She denied suicidal and homicidal ideation, had "alright" mood, had neutral affect, and was coherent. (R. at 235). She was compliant with medication and continued to engage in therapy. (R. at 235).

At a pre-operative examination on December 22, 2009, Dr. Reeher noted that Plaintiff's mental state was stable on her current medications, and that she did not appear to be severely depressed or suicidal. (R. at 453).

On February 11, 2010, Dr. Novero indicated that Plaintiff's anxiety and depression had increased as a result of physical health issues. (R. at 446). Insomnia had also increased. (R. at 446). Plaintiff's mood was irritated and her affect was blunt. (R. at 446). She was logical and coherent, however, and denied suicidal or homicidal ideation. (R. at 446).

At a January 3, 2010 medication check, Plaintiff informed Dr. Novero that her anxiety had increased, as had her irritability, due to physical medical issues. (R. at 447). Her mood

6

lability had increased, but her mood at the time of her appointment was calm and her affect was neutral. (R. at 447). She denied suicidal or homicidal ideation. (R. at 447).

On July 8, 2010, Plaintiff complained of increased crying spells and increased anxiety. (R. at 448). She was only occasionally moody, irritable, and depressed. (R. at 448). Her energy had decreased, but she was sleeping "ok." (R. at 448). Plaintiff was calm and her mood was "ok." (R. at 448). She denied suicidal or homicidal ideation. (R. at 448).

Plaintiff was evaluated again by Dr. Novero on August 9, 2010. (R. at 465). She complained of increased depression and anhedonia. (R. at 465). Plaintiff was noted to be compliant with her medications and engaged in ongoing therapy. (R. at 465). Plaintiff's mood and affect were notably depressed. (R. at 465). Plaintiff denied suicidal and homicidal ideation, however. (R. at 465).

On October 7, 2010, Dr. Novero noted that in spite of complaints of increased crying spells, Plaintiff's depression was not worsening. (R. at 464). She was composed, had normal speech, had good insight and judgment, had euthymic mood, had appropriate affect, had logical and coherent thought processes, and had no suicidal or homicidal ideation. (R. at 464).

On December 12, 2010, Plaintiff reported feeling depressed. (R. at 463). Dr. Novero noted her behavior to be composed, her concentration to be good, her speech to be normal, her insight and judgment to be good, her mood to be depressed, her affect to be blunted, and her thought processes to be logical and coherent. (R. at 463). Her sleep was "ok." (R. at 463).

In his last treatment note on record, Dr. Novero noted on January 31, 2011 that Plaintiff reported increased crying spells and increased mood swings. (R. at 462). He observed her mood to be depressed and her affect to be neutral. (R. at 462). Her behavior was composed, her

7

concentration was good, her speech was normal, her insight and judgment were good, and her thought processes were logical and coherent. (R. at 462).

## C. Functional Capacity Assessments

On September 15, 2009, Julie Uran, Ph.D. completed a Clinical Psychological Disability Evaluation of Plaintiff. (R. at 323 – 30). Plaintiff's educational history was noted, and Dr. Uran opined that Plaintiff had only fair reading skills, and poor spelling and mathematics skills. (R. at 323). Plaintiff was noted to have a child, and was receiving public assistance in the form of food stamps and medical assistance, at that time. (R. at 323). Plaintiff stopped working in December 2008 due to difficulty with paperwork, mathematics, and making change. (R. at 323). She also claimed to experience depression and irritability. (R. at 323). Plaintiff stated that she was poorly organized and had difficulty paying attention. (R. at 324). She avoided activity requiring sustained mental effort. (R. at 324). Plaintiff explained that she struggled with severe mood swings, violent behavior, and impulse control. (R. at 324, 326). She admitted to suicidal and homicidal ideation. (R. at 325). Plaintiff complained of short term memory problems, poor concentration, and poor sleep. (R. at 324). Plaintiff was engaged in medication management and therapy for her psychiatric issues. (R. at 324). Plaintiff believed that she was doing poorly, nonetheless. (R. at 324).

Upon examination, Dr. Uran found Plaintiff to be adequately groomed. (R. at 325). She drove herself to the assessment. (R. at 325). She was cooperative throughout and made good eye contact. (R. at 325). Plaintiff's speech was spontaneous and coherent. (R. at 325). Her mood was restricted and blocked, and her affect was flat. (R. at 325). There was no evidence of disturbance in thought or sensory distortions. (R. at 325). Plaintiff's thought processes were normal and relevant. (R. at 325). Dr. Uran observed some degree of visible hyperactivity in

8

terms of fidgeting and difficulty remaining seated. (R. at 324). Below average to borderline intelligence was suspected. (R. at 325). Plaintiff exhibited difficulty with limited vocabulary and mathematics. (R. at 325). Plaintiff had intact memory, appropriate judgment, and limited insight. (R. at 326).

Dr. Uran diagnosed intermittent explosive disorder, recurrent major depression, generalized anxiety disorder, attention deficit hyperactivity disorder, and polysubstance dependence, in remission. (R. at 326). Plaintiff's GAF score was 50[5]. (R. at 326). Plaintiff's prognosis was poor. (R. at 326). She was capable of managing her own funds. (R. at 326). In terms of specific functional limitations, Dr. Uran opined that Plaintiff would experience marked limitation understanding remembering and carrying out detailed instructions, interacting appropriately with the public, supervisors, and co-workers, responding appropriately to pressures in the usual work setting, and responding appropriately to changes in a routine work setting. (R. at 329).

On October 5, 2009, state agency evaluator Edward Jonas, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 337 – 40). Following a review of the medical record, Dr. Jonas felt that the evidence supported finding impairment in the way of affective disorders, anxiety-related disorders, and substance addiction disorders. (R. at 337). As a result, Plaintiff would experience marked limitation with respect to understanding, remembering, and carrying out detailed instructions. (R. at 337 – 38). Plaintiff was otherwise only insignificantly-to-moderately limited in all areas of functioning. (R. at 337 – 38). Dr. Jonas concluded that Plaintiff would be capable of engaging in full-time work. (R. at 339). He believed that Dr. Uran overestimated the degree of Plaintiff's limitations as a result of over-

---

[5] An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

reliance upon Plaintiff's subjective complaints. (R. at 339). Plaintiff was adequately maintained with outpatient mental health treatment, and had a history on inconsistent medication compliance. (R. at 339). Plaintiff appeared capable of completing activities of daily living, could drive, and could go into the community independently. (R. at 339). The objective evidence demonstrated that Plaintiff was capable of understanding, remembering, and carrying out simple jobs instructions, performing one and two-step tasks, making simple decisions, asking simple questions, and accepting instruction. (R. at 339).

On February 11, 2010, Dr. Novero completed a Medical Assessment of Ability to do Work-Related Activities (Mental). (R. at 361). As a result of Plaintiff's impairments, he believed that she had a poor ability to deal with work stress in a usual work setting, function independently, and maintain attention and concentration. (R. at 360). She had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors. (R. at 360). He also indicated that Plaintiff met the requirements for Listing 12.04 (Affective disorders) and Listing 12.06 (Anxiety-related disorders) under 20 C.F.R., Pt. 404, Subpt. P, App'x 1. (R. at 356 – 59).

### D. Administrative Hearing

Plaintiff testified that she left her former employment in December 2008 because she felt that she was losing control of her temper and might "snap" at someone. (R. at 26). She explained that she did not want to hurt anyone. (R. at 26). Plaintiff stated that she did not do much around the house and mostly relied upon her disabled mother to manage the cooking and cleaning. (R. at 27). She also relied upon her mother to take care of her young child when she had mood swings and isolated herself in her room. (R. at 28). Plaintiff explained that a typical day involved attending appointments and sitting in her room or watching television. (R. at 30,

10

41). Plaintiff stated that she frequently had screaming and yelling spells and preferred to isolate herself. (R. at 30). These spells occurred at least three or four times per week. (R. at 31). She lashed out at both family members and strangers, under the right circumstances. (R. at 31, 37 – 38). Plaintiff also testified that she experienced crying spells several times per day. (R. at 39).

Plaintiff stated that her reading skills were not particularly sharp, and that she had poor mathematics skills. (R. at 29). She had difficulty making change. (R. at 29). If she read a book or newspaper, she skipped larger words. (R. at 29). Plaintiff stated that she was capable of driving and did so independently. (R. at 28). She preferred not to go out or socialize with others. (R. at 36). A recent trip to a restaurant for her birthday made her feel uncomfortable. (R. at 45). She claimed that she did not have any friends, and only saw her child's father when he came to visit the child. (R. at 36, 45). Plaintiff's depression resulted in a lack of motivation to engage in any activity. (R. at 40). She claimed that she needed reminders to bathe. (R. at 40).

Plaintiff struggled with recurring cysts and skin infections for many years. (R. at 33). As a result, she had undergone numerous surgeries and experienced a great deal of pain, discomfort, and physical limitation. (R. at 33 – 36). Plaintiff had difficulty sleeping, and slept approximately five or six hours per night. (R. at 43). She took frequent naps, as a result. (R. at 44).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in existence in the national economy if limited to light work involving only occasional pushing and pulling with the upper left extremity, no exposure to fumes, odors, dust, gases, and chemical irritants, no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, no more than simple work-related

11

decisions and few workplace changes, no more than occasional interaction with supervisors, co-workers, and the public, and no prolonged reading for content and comprehension, or mathematical work required of a cashier or teller. (R. at 49). The vocational expert replied that such a person would be capable of sustaining "office helper jobs," with 155,000 positions available in the national economy, "mail clerk" jobs, with 159,000 positions available, and "cafeteria attendant" jobs, with 47,000 positions available. (R. at 50). The ALJ then asked the vocational expert whether jobs would be available to an individual who would be off-task approximately fifteen to twenty percent of any given work day. (R. at 51). The ALJ responded that such a person would not be able to work full-time. (R. at 51).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work,

whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[6], 1383(c)(3)[7]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401

---

[6]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[7]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

(1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V.    DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of hidradenitis suppurativa[8], bronchial asthma, obesity, depressive disorder, anxiety disorder, and learning disorder. (R. at 12). As a result of said impairments, the ALJ determined that Plaintiff would be limited to light work with no more than occasional pushing and pulling with the upper left extremity, no exposure to fumes, odors, dusts, gases, and chemical irritants, no more than simple, routine, repetitive tasks not performed in a fast paced production environment, involving only simple work-related decisions and relatively few workplace

---

[8]      Hidradenitis suppurativa is a chronic skin condition that features pea-sized to marble-sized lumps under the skin. Also known as acne inversa, these deep-seated lumps typically develop where skin rubs together — such as the armpits, groin, between the buttocks and under the breasts. The lumps associated with hidradenitis suppurativa are usually painful and may break open and drain foul-smelling pus. In many cases, tunnels connecting the lumps will form under the skin. Hidradenitis suppurativa tends to start after puberty, persist for years and worsen over time. Early diagnosis and treatment of hidradenitis suppurativa can help manage the symptoms and prevent new lesions from developing.  Mayo Clinic, http://www.mayoclinic.com/health/hidradenitis-suppurativa/DS00818 (last visited July 26, 2013).

14

changes, no more than occasional interaction with supervisors, co-workers, and the public, and no prolonged reading for content or comprehension, or mathematical calculations such as those performed by a cashier or teller. (R. at 16). Based upon the testimony of the vocational expert, the ALJ found that despite suffering such limitations, Plaintiff was still capable of obtaining a significant number of jobs in existence in the national economy. (R. at 19 – 20). As such, Plaintiff was not considered to be eligible for DIB or SSI. (R. at 20 – 21).

Plaintiff objects to the ALJ's decision, arguing that he committed error by failing to give full weight to Dr. Novero's assessment of her ability to work, by failing to give full weight to Dr. Uran's assessment, and by failing to give full credit to Plaintiff's subjective complaints of limitation. (ECF No. 11 at 5 – 15). Defendant counters that the ALJ's decision was adequately supported with substantial evidence from the record, and should be affirmed. (ECF No. 13 at 15 – 26). The court agrees with Defendant.

Plaintiff first argues that the objective medical record provided ample support for Dr. Novero's conclusions about Plaintiff's functional capabilities, as well as his belief that Plaintiff met listings 12.04 and 12.06. (ECF No. 11 at 5 – 11). Moreover, Dr. Novero's status as a treating physician should arguably have accorded his opinion more weight. (*Id.*). Plaintiff is correct in her assertion that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on

15

the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355.

With respect to Dr. Novero's Medical Assessment of Ability to do Work-Related Activities (Mental), the ALJ's finding of inconsistency with the medical record, as well as internal inconsistency with his own treatment notes, was adequately substantiated. (R. at 14, 18). With respect to Dr. Novero's finding that Plaintiff had a poor ability to function independently, the ALJ noted that Plaintiff was capable of driving independently and attending appointments independently. (R. at 14, 18). Additionally, Dr. Novero provided no supporting evidence from the record to bolster his conclusion. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F. 2d 1058, 1066 (3d Cir. 1993). "Where these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect.'" *Id.* The ALJ's analysis was supported by substantial evidence, here.

With respect to Dr. Novero's listings assessments, the ALJ adequately addressed the inapplicability of these findings to Plaintiff's case. It has been established that as long as the ALJ's decision – when read as a whole – reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings, the ALJ's determination is supported by substantial evidence. *Jones v. Barnhart*, 364 F. 3d 501, 505 (3d Cir. 2004). The ALJ must adequately develop the case record and discuss the findings supporting his conclusion that none of the listings at Step 3 are met. *Id.* at 504 – 05 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 119 – 20 (3d Cir. 2000)). However, in so doing,

16

the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Id.* at 505. *See Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 470 – 71 (3d Cir. 2005) (An ALJ satisfies *Jones* and *Burnett* "by clearly evaluating the available medical evidence in the record and then setting forth the evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."); *Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008) ("[A]n ALJ need not specifically mention any of the listed impairments."). The ALJ met this standard.

Listing 12.04 provides that in order to make a finding of disability due to affective disorders, the record must demonstrate:

disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
   a. Anhedonia or pervasive loss of interest in almost all activities; or
   b. Appetite disturbance with change in weight; or
   c. Sleep disturbance; or
   d. Psychomotor agitation or retardation; or
   e. Decreased energy; or
   f. Feelings of guilt or worthlessness; or
   g. Difficulty concentrating or thinking; or
   h. Thoughts of suicide; or
   i. Hallucinations, delusions or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
   a. Hyperactivity; or
   b. Pressure of speech; or
   c. Flight of ideas; or
   d. Inflated self-esteem; or
   e. Decreased need for sleep; or
   f. Easy distractibility; or
   g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

17

h. Hallucinations, delusions or paranoid thinking;

Or

        3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
        1. Repeated episodes of decompensation, each of extended duration; or
        2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
        3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.04. While Plaintiff may have met the

requirements for 12.04A, the ALJ correctly points out that Dr. Novero's assertion that she

meets both 12.04B and C is without support.

As to his finding of marked restriction in activities of daily living, there is no

objective proof of such limitations, only Plaintiff's statements that she simply does not

contribute to the household. (R. at 14). Moreover, notations by treating medical sources

typically indicated that she had adequate hygiene and grooming. (R. at 14). Plaintiff was

capable of driving independently to appointments. (R. at 14, 18). As found by the ALJ, Dr. Novero's check-box notation carries little weight without objective support. (R. at 14, 18).

With respect to the finding of marked limitation in concentration, persistence, and pace, Dr. Novero's own treatment notes conflict with this notation. (R. at 18). His two most recent treatment sessions with Plaintiff included specific findings that her concentration was "good." (R. at 462 – 63). Additionally, Dr. Jonas only found Plaintiff's concentration, persistence, and pace to be moderately limited. (R. at 14). Dr. Uran indicated that while Plaintiff was slow, she had adequate concentration, persistence, and pace to complete simple tasks. (R. at 19, 328).

Additionally, the ALJ found that Dr. Novero provided no objective support for his findings that Plaintiff could not acclimate to marginal adjustment without decompensation, or that she could not functioning outside a highly supportive living environment. (R. at 18). Despite numerous physical issues and surgeries, and fluctuations in her mental state, Plaintiff did not require any mental health-related hospitalizations after January 13 – 16, 2009, and Dr. Novero noted that she had no history of repeated episodes of decompensation of extended duration. (R. at 18). Further, while he indicated that she could not function outside a highly supportive living arrangement, Plaintiff was capable of driving independently to appointments. (R. at 18). Further, during his treatment of Plaintiff, Dr. Novero never made mention of a need for additional treatment at a facility which would provide a more structured environment. (R. at 18). Once again, Dr. Novero provided no objective support for his findings. The ALJ's conclusion as to Listing 12.04 was supported by substantial evidence.

19

Listing 12.06 provides that in order to find a claimant disabled by anxiety-related

disorders, the record must demonstrate that:

> anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

> A. Medically documented findings of at least one of the following:
>> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>>> a. Motor tension; or
>>> b. Autonomic hyperactivity; or
>>> c. Apprehensive expectation; or
>>> d. Vigilance and scanning;

> Or

>> 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>> 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
>> 4. Recurrent obsessions or compulsions which are a source of marked distress; or
>> 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

> And

> B. Resulting in at least two of the following:
>> 1. Marked restriction of activities of daily living; or
>> 2. Marked difficulties in maintaining social functioning; or
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>> 4. Repeated episodes of decompensation, each of extended duration.

> Or

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.06. However, the court need not look beyond 12.06A. Dr. Novero found that Plaintiff exhibited motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning. (R. at 356). Yet, as noted by the ALJ, Dr. Novero provided no evidence from the objective medical record to support these check-box findings. (R. at 18). A review of the record by this court confirms the ALJ's assertion. No such findings were made by Dr. Novero in his treatment notes. As such, the ALJ provided substantial evidence to support rejection of qualification under Listing 12.06.

Plaintiff next argues that the ALJ did not properly consider the findings of Dr. Uran, specifically, her findings of marked limitation interacting with supervisors, co-workers, and the public, as well as responding to work pressures and changes. (ECF No. 11 at 7 – 11). The ALJ relied primarily upon the opinion of Dr. Jonas to refute Dr. Uran's findings – Dr. Jonas having faulted Dr. Uran for over-reliance on Plaintiff's subjective complaints as opposed to an objective medical record that did not fully corroborate said complaints. (R. at 19). In spite of Dr. Uran's findings, the ALJ noted that Plaintiff was able to go out alone, drive alone, maintain friendships, attend group therapy, live with her mother, sister, and cousin, and interact with the father of her child on a daily basis. (R. at 14, 18 – 19). Plaintiff also neglected to note that Dr. Novero found Plaintiff to have a fair ability to interact with co-workers, supervisors, and the public. (R. at 360). As such, the ALJ provided ample evidence to support his contention that Dr. Jonas' findings were more consistent with the medical record than Dr. Uran's.

(R. at 19). "State agent opinions merit significant consideration." *Chandler*, 667 F. 3d at 361.

While Plaintiff was clearly displeased with the ALJ's discussion and preference for the findings of Dr. Jonas, in cases such as the one at present, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981). The ALJ must provide an explanation supported by substantial evidence to justify the rejection of pertinent evidence. *Fargnoli v. Massanari*, 247 F. 3d 34, 43 (3d Cir. 2001). However, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F. 3d 501, 503 (3d Cir. 2004). In light of this standard and the ALJ's discussion, the Court finds that the ALJ met his burden, here.

Lastly, Plaintiff argues that due weight was not accorded to her subjective complaints. (ECF No. 11 at 12 – 15). Plaintiff claims that the ALJ did not satisfactorily put forth sufficient evidence to disprove her subjective claims. However, it is Plaintiff that bears the ultimate burden of producing sufficient evidence to demonstrate disability. *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001). Although the Act "provides an applicant with assistance to prove his claim, the ALJ does not have a duty to search for all of the relevant evidence available, because such a requirement would shift the burden of proof." *Id.* (citing *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974)). The ALJ is required only to demonstrate that in spite of a

22

claimant's medical history, he or she is able to work. What was notable to the ALJ, as to this court, was the lack of objective medical evidence to back Plaintiff's subjective claims. (R. at 16 – 19).

Plaintiff cites her testimony that she relied upon her mother to complete household chores and to care for her child on bad days. Yet Plaintiff provides no objective evidence that she is incapable of completing such daily activities, and the ALJ found no such evidence within the record. Dr. Jonas opined that Plaintiff would likely be capable of activities of daily living. (R. at 14, 19). The ALJ noted Plaintiff's ability to go out regularly for appointments and to drive independently. (R. at 14, 16 – 19). Plaintiff testified that she had no friends, yet informed Dr. Uran that she did. (R. at 14). Plaintiff was capable of living with her mother, sister, and cousin, and seeing the father of her child every day. (R. at 14, 16 – 19). While the ALJ did not doubt that Plaintiff had limitations, the objective record did not support the degree of limitation alleged by Plaintiff.

An ALJ should accord subjective complaints similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). The ALJ is required to assess the intensity and persistence of a claimant's complaints, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* While subjective complaints may support a disability determination, allegations must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122. Here, the ALJ found that Plaintiff's

23

subjective complaints were not entirely consistent with the objective record, and supported his conclusions with substantial evidence.

## VI.   CONCLUSION

Based upon the foregoing, the court finds that substantial evidence supported the determination by the ALJ. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 10) is denied; Defendant's Motion for Summary Judgment (ECF No. 12) is granted; and, the decision of the ALJ is affirmed. Appropriate orders follow.

*s/ Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

cc/ecf: Terry K. Wheeler, Esq.
56 Clinton Street
Greenville, PA 16125
(724) 588-1441

Michael Colville, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 894-7337